UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL GRECCO and MICHAEL
GRECCO PRODUCTIONS, INC.,

        Plaintiffs,

  -against-

AGE FOTOSTOCK AMERICA, INC.,

        Defendant.

21-cv-423 (JSR)

MEMORANDUM ORDER

---

JED S. RAKOFF, U.S.D.J.

    Plaintiffs Michael Grecco, a photographer, and his company,
Michael Grecco Productions, Inc. (together, "Grecco"), bring this
action against Age Fotostock America, Inc. ("AF America"), a stock
photograph company that is incorporated in Delaware, after Grecco
discovered what he argues are misattributed versions of four of
his photographs — depicting characters from the Xena: Warrior
Princess and X-Files television shows — on a website owned by AF
America's Spanish parent company where licenses to the photographs
were offered for sale. Grecco claims that AF America offered the
photographs for sale without his consent in violation of 17 U.S.C.
§ 106 and removed attribution and copyright information that
originally appeared on the photos in violation of 17 U.S.C. §
1202(b).

Now before the Court are Grecco's motion for partial summary judgment and AF America's cross-motion for complete summary judgment. Grecco moves for summary judgment on his ownership of valid copyrights in the photographs and on AF America's liability for infringement under 17 U.S.C. § 106. AF America moves for summary judgment in full, seeking dismissal of both Grecco's copyright infringement claim and his Section 1202(b) claim. For the reasons below, the Court denies Grecco's motion, grants AF America's motion, and dismisses the case.

## BACKGROUND

I.   Factual Background

Except where otherwise noted, the following undisputed facts are taken from the parties' Rule 56.1 Statements:

Parties

Plaintiff Michael Grecco is a California-based photographer who makes a living by licensing photos through Plaintiff Michael Grecco Productions, Inc., a California corporation and a successor company to his previous entity, Michael Grecco Photography, Inc. ECF No. ("Pl. 56.1") ¶¶ 2-4.

Defendant AF America is a corporation incorporated in a Delaware. ECF No. 38 ("Def. 56.1") ¶ 1. AF America is a subsidiary of agefotostock Spain, S.L. ("AF Spain"), a stock photography and video agency based in Spain, with offices in Barcelona and Madrid. Id. ¶¶ 2, 4.

The Photographs Appear on AF Spain's Website

In 1993, Grecco photographed characters from the television show The X-Files for Twentieth Century Fox ("Fox"), the studio that created the show.  Pl. 56.1 ¶ 4; Def. 56.1 ¶ 28.  In 1997, Grecco similarly photographed the characters from the show Xena: Warrior Princess for the studio MCA Television ("MCA").  Pl. 56.1 ¶ 9; Def. 56.1 ¶ 28.  Grecco testified that he was hired to take these photographs on an "assignment" basis.  ECF No. 47 ("Pl. 56.1 CS") ¶ 51.

Years later four of these photographs, three from the X-Files shoot and one from the Xena shoot (the "Photographs"), were uploaded to a website, www.agefotostock.com, owned by AF Spain (a major international stock photography agency) and operated out of Spain, where they were displayed and offered to the public for licensing.  Pl. 56.1 ¶¶ 12, 14; Def. 56.1 ¶ 27.  The images had been provided to AF Spain by two contributors, Mary Evans Picture Library ("Mary Evans") and United Archives GmbH ("United Archives"), located in the United Kingdom and Germany, respectively.  Def. 56.1 ¶¶ 33-35.  AF Spain, in turn, processed the Photographs and uploaded them to its database, which is stored on servers located outside of the United States.  Id. ¶¶ 8, 33.

Like other contributors, Mary Evans and United Archives provided information, including metadata, regarding the submitted content, such as keywords, captions, and license restrictions.

Id. ¶ 36.   In this case, the metadata showed there were no restricted countries for any of the Photographs. Id. ¶ 37.   AF Spain did not confirm any of this information itself.  Instead, it received warranties from its contributors.  Id. ¶ 41.  AF Spain then provided warranties to its "local distributors," that is, wholly owned subsidiaries of AF Spain incorporated in different countries around the world that enter into direct licensing contracts with customers.  Id. ¶¶ 5, 42.

AF America's Role as Local Distributor

The local distributor in the United States is AF America; as with AF Spain's other local distributors around the world, AF America is authorized to license the content of AF Spain's website to customers in its designated territory.  Id. ¶ 5.   This authorization is implemented through a general licensing agreement between AF American and AF Spain, by which AF America is automatically granted a limited sublicense to every image uploaded to AF Spain's website.  Pl. 56.1 ¶ 18.  Under the terms of the general licensing agreement, AF America agreed to "advertise, promote, market and license the Visual Content to customers in the [United States]."  Id. ¶ 19.  This agreement was drafted by AF Spain's in-house counsel and executed by Alfonso Gutierrez as both President of AF America and Managing Director of AF Spain.  Id. ¶¶ 43-44.

AF America does not maintain its own website, instead relying on AF Spain to store and host the content it licenses and to negotiate with content suppliers. Id. ¶ 57. AF America only has two employees, both of whom act as "sales agents" for U.S. customers seeking to license content from AF Spain's website. Id. ¶ 55. It has three corporate officers, two of which are also employees or officers at AF Spain and all of whom reside in Spain. Id. ¶¶ 46-47; Def. 56.1 ¶ 46 (Response to Pl. 56.1). Hiring decisions for AF America are all made by Mr. Gutierrez. Pl. 56.1 ¶ 52. As AF America's corporate representative testified, AF America exists solely to direct customers to AF Spain's website, functioning as a "sales office"; but it has no control over the website, which is solely controlled by AF Spain. Id. ¶¶ 49, 62.

The Licensing Agreement

AF Spain's website is accessible to internet users around the world. Def. 56.1 ¶ 16. A visitor to the website firsts selects a preferred country or territory from 231 different options from the top menu bar — the website then displays a version showing the images available to be licensed in the selected territory. Id. ¶ 17. In order to download and license an image, users must first register with AF Spain by creating an account. Id. ¶ 20. A user may then select an image to license at which point they will be offered a licensing agreement that is specific to the selected territory. Id. ¶ 22. For customers in the United States, they

are offered the Visual Content License Agreement, which states that the agreement is between the customer and AF America as the "supplier and licensor of the Visual Content." ECF No. 18 Ex. 1. According to the terms of the agreement, a customer is bound the licensing agreement by "downloading and/or using any visual content . . . from [AF Spain's] site." Id. The customer downloads the selected image directly from AF Spain's database in Spain. See ECF No. 36 ¶ 21.

### Grecco Contacts AF America

On September 3, 2020, Grecco notified AF America by e-mail regarding the use of the Photographs. Def. 56.1 ¶ 43. AF America forwarded this e-mail to its parent, AF Spain. Id. ¶ 43. At that time, there had been no downloads or sales of the Photographs. Id. ¶ 46. Nor had there been any downloads of the low-resolution thumbnails — or "comp" — versions of the Photographs available on the website. Id. ¶ 47. Accordingly, an employee of AF Spain responded and notified Grecco that the Photographs had been taken down and that neither AF Spain nor AF America had licensed or made any sales of the Photographs. Id. ¶ 45. However, Grecco did not believe AF Spain's assurance and commenced this action against AF America. Id. ¶ 49.

## II.  Procedural Background

Grecco sued AF America on January 18, 2021, alleging that AF America (1) directly or secondarily infringed Grecco's copyright

when it "copied, published, displayed and distributed" the Photographs without authorization in violation of 17 U.S.C. § 106; and (2) intentionally removed or altered copyright management information in violation of 17 U.S.C. § 1202(b). See ECF No. 1.

On March 4, 2021, AF America moved to dismiss the complaint in its entirety on the grounds that the Copyright Act does not apply extraterritorially. See ECF No. 15. On April 9, 2021, the Court denied the motion to dismiss, holding that because the compliant alleged that AF America maintained the website that displayed and distributed the Photographs within the United States the complaint sufficiently alleged a domestic act of copyright infringement. See ECF Nos. 20, 33.

Now before the Court is Grecco's motion for partial summary judgment and AF America's cross motion for summary judgment. Grecco seeks summary judgment with respect to his ownership of valid copyrights in the Photographs and AF America's liability for copyright infringement directly, contributorily, or as the alter ego of AF Spain. See ECF Nos. 28, 35. AF America cross-moves for summary judgment on Counts 1 and 2. See ECF Nos. 33, 48.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The movant bears the

burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).[1]

**DISCUSSION**

I.  Copyright Infringement

To prevail on a claim of copyright infringement, Grecco must show that (1) he "had a valid copyright in the work allegedly infringed" and (2) AF America "infringed [his] copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright holder." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 260 (2d Cir. 2005).

In the first instance, Grecco argues that AF America is liable for directly infringing Grecco's copyrights — even though, Grecco concedes, a license to the Photograph was never sold by AF America and the images were never downloaded in the United States — because AF America offered to license the Photographs for the express purpose of supposedly authorizing its customers to further reproduce and publish those works.  In the alternative, Grecco

---

[1] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

seeks to hold AF America liable for AF Spain's alleged infringement on either a contributory infringement or an alter ego theory.  For the reasons stated below, the Court finds that Grecco cannot establish liability on either of these grounds.[2]

A. Direct Infringement

In order for Grecco's direct liability claim to succeed, he must overcome two hurdles:  First, he must show that the Copyright Act protects against unconsummated offers to license copyrighted material.  Second, he must show that AF America did indeed make such an offer.[3]  Because the Court holds that the Copyright Act

---

[2] Because the Court holds that Grecco cannot prevail on either of these claims, it does not address the issue of whether Grecco had valid copyrights in the Photographs and denies Grecco's motion for partial summary judgment with respect to his ownership of valid copyrights in the Photographs as moot.

[3] Although AF America argues that AF Spain's conduct all occurred abroad and thus falls outside of the scope of the Copyright Act, it does not address whether any of its own allegedly infringing conduct occurred abroad — instead characterizing itself as "a passive actor" that took no relevant action in relation to the Photographs.  See ECF 35 at 25.  Therefore, in the context of addressing whether AF America's actions constitute infringing conduct, it can be assumed that the conduct occurred within the United States.  See Structured Cap. Sols., LLC v. Commerzbank AG, 177 F. Supp. 3d 816, 825 (S.D.N.Y. 2016).  Although a court has an independent obligation to determine whether it has subject matter jurisdiction, "the extraterritorial application of federal copyright law is not a jurisdictional issue." Noland v. Janssen, 2019 WL 1099805, at *5 (S.D.N.Y. Mar. 8, 2019) (citing Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co., 850 F.3d 785, 790-91 (5th Cir. 2017)).

does not extend its protections to unconsummated offers, it does not address the second leg of this inquiry.

The Copyright Act protects each copyright owner's "exclusive rights" to control certain enumerated rights, including the right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). As this language reflects, distribution requires dissemination of a "copy" which is defined, in relevant part, as a "material object . . . in which a work is fixed." 17 U.S.C. §§ 101, 101; see Agee v. Paramount Commc'ns, Inc., 59 F.3d 317, 325 (2d Cir. 1995) ("distribution is generally thought to require transmission of a 'material object' in which the [work] is fixed" (quoting 17 U.S.C. § 101)).

Relying on this language, courts have held that an unconsummated offer to sell a copyrighted work does not constitute infringement under the Copyright Act. See, e.g., Obolensky v. G.P. Putnam's Sons, 628 F. Supp. 1552, 1555-56 (S.D.N.Y. 1986) ("The courts have held that there is no violation of the right to vend copyrighted works . . . where the defendant offers to sell copyrighted materials but does not consummate a sale); Capitol Records, Inc. v. Thomas, 579 F. Supp. 2d 1210, 1219 (D. Minn. 2008)("the plain meaning of the term 'distribution' does not including making available and, instead, requires actual dissemination"); Atl. Recording Corp. v. Howell, 554 F. Supp. 2d

976, 984-85 (D. Ariz. 2008) ("An offer to distribute does not constitute distribution [because the] plain meaning of [Section 106(3)] requires an identifiable copy of the work to change hands in one of the [statute's] prescribed ways for there to be a distribution."); see also 4 William F. Patry, Patry on Copyright § 13.9 (2021) (mere offer to distribute does not violate Section 106(3)).

Nevertheless, Grecco argues that a mere "offer[] to license to the public another's copyrighted works, without a valid license" constitutes infringement under the Copyright Act. See ECF No. 28 at 12. In support of this proposition, Grecco relies primarily on Judge Karas's decision in Elektra Ent. Grp., Inc. v. Barker, 551 F. Supp. 2d 234, 243 (S.D.N.Y. 2008), which stated — in the context of rejecting the plaintiff's bid to recognize an even broader "make available" right under the Copyright Act — that even an unconsummated offer "can violate the distribution right of Section 106(3)."[4]

---

[4]   Grecco further notes that the conclusion in Elektra is shared by the Copyright Office. See Letter from Marybeth Peters, Register of Copyrights, to Rep. Howard L. Berman, Rep. from the 28th Dist. of Cal. (Sept. 25, 2002).  However, letters from the Copyright Office to Congress on matters of statutory interpretation are only "entitled to respect insofar as they are persuasive." Broadcast Music, Inc. v. Roger Miller Music, Inc., 396 F.3d 762, 778 (6th Cir. 2005).  Grecco fails to identify why the Copyright Office's letter ought to be considered persuasive by the Court.

As the Elektra court noted, "[t]he word 'distribute' . . . is not defined in the Copyright Act," but the Act does define "publication" in language that "closely mirrors the language of Section 106(3)" with the only difference being that the definition of "publication" also includes language about "offering to distribute." Id. at 240. The court went on to find the terms "publication" and "distribution" to be synonymous, relying in large part on the Supreme Court's decision in Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 552 (1985), which it characterized as having "found 'distribution' and 'publication' to be synonymous" based on the legislative history. 551 F. Supp. 2d at 240.

But, as other courts have explained, the Elektra court's reliance on the Harper & Row decision overstates what was held in that case. There, "the Supreme Court narrowly addressed the issue of first publication. It did not discuss the meaning of the term distribution; nor did it discuss publication or distribution in general." Capitol Records, Inc. v. Thomas, 579 F. Supp. 2d 1210, 1220 (2008); see also London-Sire Records, Inc. v. Doe 1, 542 F. Supp. 2d 153, 168 (2008) ("[The Harper & Row decision] is a far cry from squarely holding that publication and distribution are congruent."). Moreover, elsewhere within that decision, "the Supreme Court used language that recognized that publication and distribution are two distinct concepts." Capitol Records, 579 F.

Supp. 2d at 1220; see, e.g., Harper & Row, 471 U.S. at 546-47 ("Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright. Under the Copyright Act, these rights — to publish, copy, and distribute the author's work — vest in the author of an original work from the time of its creation." (emphasis added)).

"It is axiomatic that the plain meaning of a statute controls its interpretation." Lee v. Bankers Tr. Co., 166 F.3d 540, 544 (2d Cir. 1999). As noted above, the statute defines "publication" to include both distribution and offers to distribute. This supports the interpretation that while "all 'distributions . . . to the public' are publications[,] not all publications are distributions." London-Sire Records, 542 F. Supp. 2d at 169. "[U]nless a contrary result is readily apparent, we generally presume Congress intends different terms in the same statute to have different meanings." WNET v. Aereo, Inc., 722 F.3d 500, 507 (2d Cir. 2013).[5]

---

[5] Grecco also points to the language of Section 106(3) that protects the right "to authorize" others to distribute, which he suggests further supports that an offer for others to distribute constitutes infringement. However, as numerous courts, including the Elektra court, have held, the "'to authorize' language was added by Congress solely for the purpose of making it expressly clear that a copyright holder can assert contributory infringement as well as direct infringement." Laine v. Pride, 2021 WL 199927, at *7 (S.D.N.Y. Jan. 19, 2010); accord Elektra, 551 F. Supp. 2d at 246-47 ("[U]nless one of [the specified] rights is infringed, the

As such, the Court declines to expand the definition of "distribution" — and, with it, the scope of potential liability under the Copyright Act — and holds instead that an unconsummated offer to distribute does not give rise to liability under Section 106(3) of the Copyright Act. Therefore, because AF America, at most, only offered to license the Photographs, Grecco cannot prevail on its claim against AF America for directly infringing on his copyrights.

B. Secondary Infringement

Grecco seeks, in the alternative, to hold AF America liable for AF Spain's purported copyright infringement, namely AF Spain's publication of the Photographs to its website. In particular, Greeco asserts that AF America can be held liable either as the "alter ego" of its parent, AF Spain (that is, through reverse veil-piercing) or on a contributory infringement basis. But in order to establish liability on either of these grounds, the Court first must find that AF Spain's conduct fell within the scope of the Copyright Act. See Giuliano v. Barch, 2017 WL 1234042, at *15 (S.D.N.Y. Mar. 31, 2017) ("[T]he concept of veil-piercing . . . assumes that the corporation itself is liable for the obligation sought to be imposed [and] does not constitute a cause of action

---

copyright holder has no recourse in law under" the "to authorize" language.).

independent of that against the corporation."); Faulkner v. Nat'l Geographic Enters., 409 F.3d 26, 40 (2d Cir. 2005) ("there can be no contributory infringement absent actual infringement").

Grecco's theory of secondary liability hinges on AF Spain's conduct abroad, as Grecco's allegations focus on the publication of the Photographs through the website, which, Grecco concedes, is owned, operated, and controlled by AF Spain in Spain.  Pl. 56.1 ¶¶ 12, 14; Def. 56.1 ¶ 27. "It is well established that copyright laws generally do not have extraterritorial application." Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (1988).  However, a plaintiff can state a claim for copyright infringement based on foreign activity by alleging a "predicate act" in the United States that is itself an act of copyright infringement and "permits further reproduction abroad." See Update Art v. Modiin Pub., 843 F.2d 67, 73 (2d Cir. 1988); Levitin v. Sony Music Entm't, 101 F. Supp. 3d 376 (S.D.N.Y. 2015).

"It is not a sufficient predicate act that a copyrighted work is made available online to United States users." Grecco v. Age Fotostock Am., Inc., 2021 U.S. Dist. LEXIS 144023, *9 (S.D.N.Y. 2021).  Rather, a plaintiff must establish certain "plus factors," such as: "(1) the direction of copyrighted material into the United States, (2) [that] foreign acts are intended to, and do, have an effect within the United States, and (3) the uploading of copyrighted materials to servers located in the United States."

State Street Global Advisors Trust Co. v. Visbal, 431 F. Supp. 3d 322, 340 (S.D.N.Y. 2020).

Although not contesting that the Photographs were uploaded to servers outside of the United States, Grecco argues that the "plus factors" can be found on the grounds that AF Spain's conduct was "plainly directed at the U.S. market."  ECF. No. 28 at 15.  In support of this contention, Grecco cites the license agreement between the companies, through which AF Spain "appointed" AF America to act as its "distributor" of content in the United States and imposed on AF America various "general obligations," including to "actively promote the Visual Content and use its best commercially reasonable efforts to obtain customers for and otherwise market the Visual Content within the [U.S.] Territory."  ECF No. 32 Ex. 2 at 3.  The fact that AF Spain controlled a wholly-owned subsidiary that was expressly tasked with promoting its business in the United States is sufficient, Grecco argues, to bring AF Spain's conduct within the scope of the Copyright Act.

However, as AF America argues, this general targeting of the American market does not establish a sufficient nexus between AF Spain's publishing of the specific copyrighted works at issue and the United States.  This is not a case like Spanski Enterprises, Inc. v. Telewizja Polska, S.A., 883 F.3d 904, 918 (D.C. Cir. 2018), where a foreign entity uploaded copyrighted content to its website and directed a broadcast of that specific content into the U.S. at

a user's request.  Nor is it a case like the hypothetical scenario contemplated and deemed a "closer question" by the court in Noland, 2019 WL 1099805, at *5, in which the specific copyrighted work is marketed within the United States.  Given the absence of a more specific and tangible connection between AF Spain's conduct and the United States, the Court cannot conclude that AF Spain sufficiently directed the Photographs into the United States so as to give rise to a predicate domestic act.[6]

Grecco also seeks to show that AF Spain's actions were intended and did have an effect in the United States.  But, given that no person in the United States ever purchased a license to the Photographs, Grecco can raise only broad concerns about the manner in which his business is affected when others offer to license his works in the United States, such as that it "undermines

---

[6] Attempting to forge a more specific nexus, Grecco points to an e-mail exchange in which AF Spain discusses U.S. sales with a representative of United Archives, the suppliers of the X-Files photographs.  See ECF No. 32 Ex. 3.  Although Grecco describes these e-mails as evidencing an intention to direct the Photographs in particular into the United States, they do not support that characterization.  Moreover, the notion that marketing even the specific works at issue could give rise to a sufficient nexus is based on dicta in Noland, 2019 WL 1099805, at *5.  In that case, the court conjectured that marketing might give rise to a nexus were the court to conclude that an unconsummated offer constituted infringement.  See id.  Because the Court now holds that such conduct is not sufficient to establish a violation of the Copyright Act, it follows that even the marketing of the specific works at issue in the United States may not be sufficient to establish a domestic nexus on its own.

the exclusivity of [his] work" and "proliferates . . . the assumption that the work is available to anyone, anywhere, any time." ECF No. 31 Ex. 7 at 174:16-175:6. Grecco cites no case law in support of so abstract an "effect" constituting a sufficient linkage to the United States. Moreover, Grecco does not assert that the cited effects were in anyway intended by AF Spain, as opposed to merely incidental to AF Spain's non-domestic conduct. See GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co., 782 F. Supp. 763, 773 (W.D.N.Y. 1991). As such, this purported "plus factor" too falls short.

Accordingly, given the limitation on the extraterritorial application of United States copyright law, Grecco's secondary liability claims cannot succeed. And because, as discussed above, Grecco also cannot prevail on its direct liability claims, the Court denies Grecco's motion for partial summary judgment and grants summary judgment to AF Spain with respect to Count 1.

## II. Copyright Management Information

"The 1998 Digital Millennium Copyright Act ('DMCA') protects against the removal or alteration of copyright management information ('CMI'), which is defined in part as identifying information about the author of a work 'conveyed in connection with' the work." Mango v. BuzzFeed, Inc., 356 F. Supp. 3d 368, 376 (S.D.N.Y. 2019) (citing 17 U.S.C. § 1202(b)). The relevant part of the DMCA, Section 1202(b), "prohibits three kinds of acts,

each corresponding to its numbered subparts": "The first is the removal or alteration of CMI . . . . The second is the distribution of CMI with missing or altered information.  The third is the distribution of works with missing or altered CMI . . . ." Id. Here, Grecco appears to assert claims under both the first and third parts of Section 1202(b), that is, removing or altering CMI and distributing works with missing or altered CMI, respectively.

To establish a violation of Section 1202(b)(1), Grecco must prove: "(1) the existence of CMI on the infringed work; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." Craig v. UMG Recordings, Inc., 380 F. Supp. 3d 324, 337 (S.D.N.Y. 2019). Similarly, to establish a violation of 1202(b)(3), Grecco must prove, "(1) the existence of CMI in connection with a copyrighted work; and (2) that [AF America] distribute[d] . . . works [or] copies of works; (3) while knowing that [CMI] has been removed or altered without authority of the copyright owner or the law; and (4) while knowing or . . . having reasonable grounds to know that such distribution will induce, enable, facilitate, or conceal an infringement." Zuma Press, Inc. v. Getty Images (US), Inc., 845 F. App'x 54, 57 (2d Cir. 2021).[7]

---

[7] The Second Circuit has held that Section 1202(b)(3) includes a "double-scienter" element. Mango v. BuzzFeed, Inc., 970 F.3d 167, 172 (2d Cir. 2020).  Thus, Grecco must show not only that AF America knew the CMI had been removed or altered without proper

Here, Grecco fails to present sufficient evidence to satisfy either the intention prong under § 1202(b)(1) or the knowledge prong under § 1202(b)(3). Even assuming the Photographs had originally had CMI, nothing in the evidentiary record indicates that AF America — or AF Spain, for that matter — either intentionally removed the CMI or had reason to know that the CMI had been improperly removed. As AF America argues, there is not even evidence suggesting that the Photographs contained CMI when AF Spain obtained them from the two contributors.

In response, Grecco argues that the reason he has been unable to produce evidence regarding whether the files submitted to AF Spain by its contributors included Grecco's CMI is because AF Spain deleted the image files and metadata from its systems after receiving Grecco's notice of infringement. See ECF No. 37 Ex. A 120:10-121:11, 121:14-122:6. Grecco argues that this supports an adverse inference against AF America or, in the alternative, a determination that material facts are in dispute precluding summary judgment.

AF America replies that AF America did in fact produce the metadata for the images, Def. 56.1 ¶ 37, as well as the

_____

authority, but also that AF America knew or had reason to "know that distribution of copyrighted material despite the removal of CMI 'will induce, enable, facilitate, or conceal an infringement.'" Id. (quoting 17 U.S.C. § 1202(b)(3)).

documentation that accompanied the X-Files Photographs, which were obtained from the contributor after litigation commenced, ECF No. 37 Ex. B at 134:4-25.  Additionally, it asserts that contrary to Grecco's statement, AF Spain's witness only testified that AF Spain removed the Photographs from its database, not that it permanently deleted the images or did not retain backups, see ECF No. 37 Ex. A 120:10-121:11.  Finally, AF American argues that it should not be subject to a negative inference based on the actions of AF Spain, which is a separate entity and subject to different obligations under Spanish and European Union Law.

While an adverse inference may be available when a party destroys evidence negligently or in bad faith, see Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 110 (2d Cir. 2002), Grecco has failed to show that this is such a case.  Given that Grecco has put forward nothing to suggest that AF Spain did anything other than appropriately respond to Grecco's take down order, the Court declines to draw a negative inference, even assuming that AF America can be held responsible for AF Spain's actions.  Because Grecco's Section 1202(b) claims depend on such an inference given the absence of evidence favorable to Grecco regarding what CMI the Photographs contained when they were obtained by AF Spain, the Court grants summary judgment to AF America with respect to Count 2.

CONCLUSION

For the foregoing reasons, the Court denies Grecco's motion for partial summary judgment and grants AF America's cross-motion for summary judgment in its entirety.  The Clerk of the Court is directed to enter final judgment, dismissing the case with prejudice.

SO ORDERED.

Dated:   New York, NY

October 4, 2021          JED S. RAKOFF, U.S.D.J.